**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

TOMMY ARNELL RUSSELL,

Plaintiff,

v. No. CIV 17-1272 RB/JFR

HONORABLE MATTHEW P. DONOVAN,[1]
Secretary, United States Air Force,
DEPARTMENT OF THE AIR FORCE,

Defendants.

## MEMORANDUM OPINION AND ORDER

Mr. Tommy Russell (Plaintiff) worked for the Air Force as a civilian. On March 26, 2014, Senior Master Sergeant (SMSgt) Anthony Pivirotto directed Plaintiff to print a document. Plaintiff flatly refused, first in an email, and later in a confrontation in SMSgt Pivirotto's office. Plaintiff declared that he was not SMSgt Pivirotto's house boy or slave and that he would file an Equal Employment Opportunity (EEO) complaint against him. Air Force leadership, concerned with Plaintiff's response to the direction in light of the fact that he worked with sensitive and classified information, imposed escalating discipline. Ultimately, the Air Force proposed Plaintiff's removal from his position. Rather than responding to the proposed removal, Plaintiff resigned. He now claims that all discipline was imposed in retaliation for his filing of an EEO complaint. He also brings suit for constructive discharge.

[1] Matthew Donovan became acting Secretary of the Air Force June 1, 2019, and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

This matter is before the Court on Defendant Donovan's[2] Motion for Summary Judgment and Memorandum in Support, filed on May 2, 2019. (Doc. 46.) Jurisdiction arises under 28 U.S.C. § 1331. For the reasons stated in this Opinion, the Court will grant summary judgment in favor of Defendant and dismiss Plaintiff's claims.

## II. Legal Standards

Plaintiff's "pro se . . . pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)). The Court may not, however, "serv[e] as the litigant's attorney in constructing arguments and searching the record." *Id.* (citation omitted).

### A. Summary Judgment Standard of Review

Summary judgment is appropriate when the Court, viewing the record in the light most favorable to the nonmoving party, determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id*. The moving party bears the initial responsibility of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

[2] The Court notes that Defendant Donovan is the only proper party named. *See Gonzales v. Sec'y of Air Force*, 824 F.2d 392, 393 (5th Cir. 1987) (noting that the Secretary of the Air Force is "the only proper party sued or served"); *Johnson v. U.S. Postal Serv.*, 861 F.2d 1475, 1484 (10th Cir. 1988) (discussing *Paulk v. Dep't of Air Force*, 830 F.2d 79, 82–83 (7th Cir. 1987), where the Seventh Circuit found that the district court should have tolled the statute of limitations where a pro se "plaintiff had named the U.S. Air Force as defendant rather than . . . the Secretary of the Air Force").

(1986)). Once the moving party meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (quotation marks omitted).

**B. Relevant Local Rules**

Pursuant to Local Rule 56, the party moving for summary judgment "must set out a concise statement of all of the material facts as to which the movant contends no genuine issue exists." D.N.M. LR-Civ. 56(b). The movant must number the facts "and must refer with particularity to those portions of the record upon which the movant relies." *Id.* In return, the non-moving party must also provide "a concise statement of the material facts . . . as to which the non-movant contends a genuine issue does exist." *Id.* The non-movant must number each fact in dispute, "must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed." *Id.* "**All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.**" *Id.* (emphasis added).

Defendant provides a lengthy statement of Material Facts (MF). (*See* Doc. 46 at 3–10.) Plaintiff makes no attempt to dispute MF Nos. 1, 2, 4, 7–12, 16, 19–20, 23, 27–28, 31–32, 34, 37–38, 44–45, 48, 52–54, and 56–64. (*See* Doc. 56 at 4–14.) Plaintiff comments on MF Nos. 3, 5–6, 15, 22, 29–30, 33, 40, 43, 49, 51, and 55, but he does not refer to the record. (*See id.*) Plaintiff refers to the record regarding MF Nos. 13–14, 17–18, 21, 24–26, 35–36, 39, 41–42, 46–47, and 50, but his references do not create a genuine dispute of fact. (*See id.* at 5–14.) Because Plaintiff has failed to specifically controvert Defendant's facts, the Court deems those facts undisputed.

## II. Factual and Procedural Background[3]

In 2014, Plaintiff was a civilian employed by the United States Department of the Air Force and served as a Client Support Administrator for the 377th Security Support Squadron, 377th Security Forces Group, 377th Airbase Wing, Kirtland Air Force Base. (Doc. 46-A ¶ 2.) On March 25, 2014, Colonel (Col) Paul Barney, then Commander of the 377th Security Forces Group and Plaintiff's second level supervisor, emailed SMSgt Pivirotto, Superintendent of the 377th Security Support Squadron, and directed him to set up a telephone for a March 27, 2014 teleconference. (*Id.* ¶¶ 1, 6.) SMSgt Pivirotto then emailed Plaintiff and asked him to set up the telephone and print the relevant call-in numbers. (*See* Doc. 46-B at 3–4.)

Plaintiff responded via email, "I'm not a flunky, you can print you[r] own numbers off, as the email was sent to you." (*Id.* at 2.) SMSgt Pivirotto replied, "I have given you the direction I expect you to take. Have the telephone set up . . . and the call in numbers printed and placed next to the phone" by March 26, 2014. (*Id.*) Plaintiff emailed again and questioned SMSgt Pivirotto's authority to give him directions. (*See id.*) Plaintiff emailed a final time and stated, "You know what I'm going to file an EEO complaint against you for sure, you['re] not going [to] treat me like a slave . . . or house boy." (*See id.* at 1.)

On March 26, 2014, Plaintiff set up the telephone but did not print the call-in numbers. (*See* Doc. 46-C at 56:4–21.) SMSgt Pivirotto emailed Plaintiff again and asked him to have the call-in numbers printed by 8:30 a.m. on March 27, 2014. (*See* Doc. 46-D-1 at 1.) On the afternoon of March 26, Plaintiff visited SMSgt Pivirotto's office and asked him why he was unable to print the call-in numbers himself. (Doc. 46-C at 54:9–13.) In a memorandum SMSgt Pivirotto later

[3] In accordance with summary judgment standards, the Court recites all admissible facts in a light most favorable to the Plaintiff. Fed. R. Civ. P. 56; *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The Court recites only that portion of the factual and procedural history relevant to this motion.

prepared for his own supervisor (Captain (Capt) Steven Brenoskie) about this incident, he stated his perception that Plaintiff was "visibly agitated" and demanded to know why SMSgt Pivirotto could not print the numbers because he "sat so close to the printer." (*See* Doc. 46-D-1 at 1.) Plaintiff said, "You want the Black man to do it, I've got something for you."[4] (*See id.*) Plaintiff left work on March 26 without printing the call-in numbers, and he did not return to work on March 27, 2014. (*See* Docs. 56-F-2; 56-F-3; 46-C at 56:22–57:5.)

**Suspension of Plaintiff's Unescorted Access to Restricted Areas, Access to the Local Area Network (LAN), and Access to the Secret Internet Protocol Router (SIPR) and Non-classified Internet Protocol Router (NIPR) Accounts**

Based on Plaintiff's "alleged insubordination and failure to follow direction[,]" Col Barney issued a memorandum on March 31, 2014, notifying Plaintiff of the decision to remove his "access to classified information[,]" including his "unescorted access to restricted areas" and his access to the LAN and all SIPR and NIPR accounts. (*See* Doc. 46-A-2.) Col Barney stated that he would "evaluate the incident and make a security determination" regarding Plaintiff's access after "the initial investigation in this case has been completed . . . ." (*See id.*) The memorandum informed Plaintiff that he had 72 hours to provide a rebuttal reply. (*See id.*) Plaintiff signed and acknowledged receipt of the memorandum and indicated he intended to file a reply. (*See id.*)

On April 2, 2014, Plaintiff emailed Col Barney and asked for statements or documents pertaining to the investigation, names of accusers/witnesses, etc. (*See* Doc. 46-A-3.) Col Barney advised Plaintiff to contact Mr. Nivens, the Security Manager, to obtain any requested documentation. (*See id.*) He also advised Plaintiff to contact Capt Brenoskie. (*Id.*) Plaintiff never

[4] Plaintiff disputes SMSgt Pivirotto's memory of Plaintiff's words as hearsay on the basis that "Capt. Dinkins did not witness anything." (*See* Doc. 56 at 5.) This is irrelevant, as SMSgt Pivirotto wrote this memorandum. Moreover, Plaintiff admitted in his Complaint that he told SMSgt Pivirotto, "you know what I got something for you[;] I'm going to file a EO complaint against you because you just want the black man to do it." (Doc. 1 (Compl.) ¶ 16 (quotation marks omitted).)

submitted a reply to the memorandum, nor did he seek an extension of the time allowed for his reply. (*See* Doc. 46 MF Nos. 19–20.)

Col Barney drafted a follow-up Memorandum for Record on May 19, 2014, explaining in greater detail his decision to remove Plaintiff's access to unrestricted areas, to the LAN, and to the SIPR and NIPR accounts. (*See* Doc. 46-A-5.) Col Barney cited Plaintiff's "outburst" on March 26, 2014, "where he refused to follow an instruction from his office superintendent," Col Barney's perception of Plaintiff's dishonesty on other occasions, and Plaintiff's "abrasive" emails to Col Barney "and others in leadership questioning [their] authority and asserting his position." (*See id.*) "It was this misuse of e-mail, and his erratic and irrational behavior that made [Col Barney] concerned for the information [they] protect—principally under [Plaintiff's] administration of [their] networks and e-mail. . . . By" March 31, 2014, he "was concerned about [Plaintiff's] unpredictability, and the potential for loss or compromise of sensitive data." (*Id.*) Col Barney has since sworn that he "did not consider [Plaintiff's] race, age, or prior EEO activity when making [his] decision." (Doc. 46-A ¶ 22.)

**Placement on Paid Administrative Leave**

Capt Paul Dinkins replaced Capt Brenoskie as the Commander of the 377th Security Support Squadron in early April 2014 and served as supervisor to both Plaintiff and SMSgt Pivirotto. (*See* Docs. 46-A ¶ 3; 46-D ¶¶ 2–3.) Capt Dinkins spoke to SMSgt Pivirotto and reviewed his memorandum about the incident. (*See* Doc. 46-D ¶ 3.) Capt Dinkins "conducted an informal fact-finding regarding the March 26, 2014[] incident" and concluded that because SMSgt Pivirotto "had tasking authority over" Plaintiff, Plaintiff "was insubordinate[5] when he refused to print out

[5] Plaintiff disputes that he was insubordinate. (*See* Doc. 56 at 6.) He asserts that because he called in sick on the morning of March 27, he did not specifically defy SMSgt Pivirotto's follow-up order to have the call-in numbers printed out by that morning. (*See id.* (citing Docs. 56-F-2; 56-F-3).) Plaintiff does not

the call in numbers and acted inappropriately when he demanded to know why SMSgt Pivirotto could not print out the numbers himself and threatened Pivirotto by stating that 'he had something for him.'" (*Id.* ¶¶ 4–5.)

Capt Dinkins "contacted Ms. Lyndsay Strong, Employee Management Relations Specialist, at Kirtland's Human Resources (HR) Office for advice on how to proceed." (*Id.* ¶ 6.) She gave Capt Dinkins three options: (1) move Plaintiff to another unit; (2) keep him in the same unit but assign him administrative work because he no longer had the necessary access to perform his job; or (3) place him on paid administrative leave. (*See id.*) Capt Dinkins chose not to reassign Plaintiff "given his recent inappropriate behavior." (*See id.*) He declined to assign him to administrative work "because there was not enough work to keep him busy." (*See id.*) On April 8, 2014, Capt Dinkins met with Plaintiff to inform him that he was being placed on paid administrative leave beginning on April 9, 2014. (*See id.*; *see also* Doc. 46-D-3.) Plaintiff did not lose pay or benefits as a result of being placed on paid administrative leave. (*See* Doc. 46-C at 126:14–127:3.) Captain Dinkins later attested that he "did not consider [Plaintiff's] race, age, or prior EEO activity when placing him on paid administrative leave." (Doc. 46-D ¶ 7.)

**<u>Oral Admonishment</u>**

Capt Dinkins met with Plaintiff again on April 15, 2014. (*Id.* ¶ 9.) Plaintiff "admitted behaving as described" and Capt Dinkins orally admonished[6] him for his conduct and failure to follow orders on March 26, 2014. (*Id.*) Plaintiff did not lose pay or benefits as a result of being

---

dispute, however, that he refused to print the numbers on March 26. (*See* Doc. 46-C at 57:2–11.) Thus, Plaintiff fails to demonstrate a genuine dispute of fact.

[6] "An oral admonishment is the lowest level of discipline under the Master Labor Agreement between the Air Force Materiel Command and American Federation of Government Employees." (Doc. 46 MF No. 31; *see also* Doc. 46-D-4 at 1.) *See also* Master Labor Agreement, https://www.afge.org/globalassets/documents/cbas/c214---afmc-contract.pdf.

orally admonished. (*See id.*) Capt Dinkins attested that he "did not consider [Plaintiff's] race, age, or prior EEO activity when orally admonishing" him. (*Id.*)

**<u>Establishment of Security Information File (SIF)</u>**

On June 2, 2014, Captain Dinkins "made a security determination to establish a [SIF] for" Plaintiff. (*Id.* ¶ 14.) "A SIF is a collection of documents generated as a result of the discovery or development of unfavorable information that brings into question a person's continued eligibility for a security clearance or access to Sensitive Compartmented Information . . . ." (*Id.*) Capt Dinkins gave Plaintiff notice via a memorandum that the action was "being taken because of [his] failure to follow orders, documented outbursts and unprofessional and erratic behavior with various members of the Air Base Wing and Squadron leadership[,]" all of which "led [Capt Dinkins] to question [his] judgment and reliability within this organization." (*See* Doc. 46-D-8.) The memorandum noted that Capt Dinkins suspended Plaintiff's unescorted access to restricted areas, to the LAN, and to all NIPR and SIPR accounts. (*See id.*) It provided that "[w]hen all final actions in this case have been completed the Air Force Central Adjudication Facility [(CAF)] will make the final security determination concerning [Plaintiff's] clearance eligibility." (*Id.*) Plaintiff signed and indicated his intent to submit a written reply within 72 hours. (*See id.*) Plaintiff filed a response, but neither party included it in the record. Capt Dinkins replied to Plaintiff's response and "decided to continue with the establishment of a [SIF]." (*See* Doc. 56-E.) Capt Dinkins stated that he did not consider Plaintiff's race, age, or prior EEO activities in establishing the SIF. (Doc. 46-D ¶ 14.)

**<u>Written Reprimand</u>**

On June 24, 2014, Capt Dinkins issued a memorandum to Plaintiff regarding a proposed reprimand for "Carelessness in the Performance of [his] Duties." (*See* Doc. 46-D-11; *see also* Doc. 46-D ¶ 20.) The reprimand was related to a separate issue—an inventory of equipment that Plaintiff

completed in February 2014. (*See* Doc. 46-D ¶¶ 20–21.) In April 2014, members of leadership questioned the results of the earlier inventory and decided to conduct a second inventory. (*See id.* ¶ 21.) Plaintiff had reported 193 items of equipment missing in the February 2014 inventory. (*See* Doc. 46-D-11 at 1.) Upon completion of the second inventory, 122 of the missing 193 items were found. (*See id.*) Capt Dinkins attests that he did not consider race, age, or prior EEO activity in issuing the memorandum.[7] (*See* Doc. 46-D ¶ 22.)

On August 13, 2014, Col Richard DeMouy, who had replaced Col Barney in July 2014, issued a memorandum to Plaintiff and gave him notice of the decision to impose a written reprimand for carelessness in the performance of his duties. (*See* Docs. 46-D-12; 46-A ¶ 1.) Col DeMouy found that the incident described in the notice of proposed reprimand was supported by a preponderance of the evidence.[8] (*See* Doc. 46-D-12 at 1.) Col DeMouy has stated that he did not make this decision based on Plaintiff's race, age, or prior EEO activity. (*See* Doc. 46-E at 4.)

**Notice of Proposed Removal**

On September 23, 2014, Capt Dinkins issued a memorandum to inform Plaintiff that he was proposing his removal from federal service due to his loss of access to the LAN and the NIPR/SIPR accounts, the establishment of a SIF, and Plaintiff's unprofessional behavior and judgment. (*See* Docs. 46-D ¶ 25; 46-D-14.) Plaintiff was encouraged to respond and present appropriate evidence, and the memorandum provided that any final decision would consider

---

[7] The memorandum provided that Plaintiff had 20 days to respond. (*See* Doc. 46-D-11 at 2.) Plaintiff submitted a response, but neither party included it in the record. (*See* Doc. 46-D-12 at 1 (noting that Plaintiff "submitted a written response for [Col DeMouy] to consider").)

[8] Plaintiff disagrees with the procedure used for the second inventory, but he does not present evidence that adequately demonstrates a genuine dispute of material fact. (*See* Doc. 56 at 11–12.)

Plaintiff's response.[9] (*See* Doc. 46-D-14 at 1–2.) Plaintiff did not submit a response. (*See* Doc. 46-C at 166:21–167:2.) Instead, he submitted his resignation on October 3, 2014. (*See* Compl. ¶ 5.)

**Plaintiff's Current Position**

Plaintiff began new employment with the Department of the Army on October 6, 2014. (*See* Doc. 46-C at 150:4–7.) He applied for his position in response to a vacancy announcement that opened on June 17, 2014, and closed on June 23, 2014. (*See id.* at 153:10–154:6.) Plaintiff participated in two interviews and was selected for his position in August 2014. (*See id.* at 155:9–156:8. He accepted the position at some point thereafter. (*See id.* at 156:9–11.)

**Plaintiff's EEO and Federal Complaints**

Plaintiff initiated pre-complaint counseling with the Kirtland Air Force Base Equal Opportunity Office on April 8, 2014. (*See id.* at 11:3–9.) He filed a formal complaint of discrimination on June 26, 2014. (*Id.* at 11:13–15.) On July 31, 2015, the Air Force issued a Final Agency Decision (FAD) finding no discrimination. (*Id.* at 12:7–9.) Plaintiff appealed the FAD to the Equal Employment Opportunity Commission (EEOC) Office of Federal Operations, which affirmed the FAD on October 3, 2017. (*See id.* at 12:17–13:1.)

Plaintiff filed his Complaint in this Court on December 29, 2017. (*See* Compl.) He asserts claims for retaliation and constructive discharge pursuant to Title VII. (*See id.*; *see also* Doc. 46 at 24.) While he also includes allegations related to discrimination based on race and age, he stipulated during his deposition that "his claims of discrimination are not based on race and age," and he is only claiming that Defendant's actions were retaliatory. (*See* Doc. 46 at 10 (citing Doc.

[9] Plaintiff asserts that the decision was final, because Capt Dinkins had already replaced Plaintiff with two other employees. (*See* Doc. 56 at 13.) Plaintiff cites to an exhibit that is not in the record and fails to create a genuine dispute of fact.

46-C at 178:1–14).) Finally, Plaintiff includes a section in his Complaint entitled "negligence," presumably brought pursuant to the Federal Tort Claims Act (FTCA). (*See* Compl. at 19.)

## III. Analysis

### A. The Court does not have jurisdiction to consider the Air Force's security-related decisions.

Relying on *Department of the Navy v. Egan*, 484 U.S. 518 (1988) and its progeny, Defendant contends that the determinations to remove Plaintiff's unescorted access to restricted areas, to remove his access to the LAN and the NIPR/SIPR accounts, and to establish a SIF are not reviewable. (*See* Doc. 46 at 13–16.) "*Egan* prohibits 'any external review (including judicial review) of security clearance decisions.'" *Sanchez v. U.S. Dep't of Energy*, 870 F.3d 1185, 1192 (10th Cir. 2017) (quoting *Duane v. U.S. Dep't of Defense*, 275 F.3d 988, 993 (10th Cir. 2002)). "This means district courts lack jurisdiction to review the merits or motives of a decision to revoke or deny a security clearance." *Id.* (citing *Hill v. Dep't of Air Force*, 844 F.2d 1407, 1411 (10th Cir. 1988)). "This bar on judicial and administrative review stems from the principle that security-clearance decisions involve sensitive and classified information of the sort best left to the Executive Branch's purview." *Id.* at 1188.

"*Egan* applies when an agency has made (1) a security-clearance decision that (2) a plaintiff attempts to challenge." *Id.* at 1192. Here, Defendant asserts that the "decisions to suspend Plaintiff's access to the LAN and NIPR and SIPR accounts, to remove Plaintiff's unescorted access to restricted areas, and to establish a [SIF] were security clearance determinations." (Doc. 46 at 15.) Defendant demonstrates that the reasoning behind these decisions was related to security concerns and to leadership's concerns that Plaintiff's poor judgment and unpredictability might compromise sensitive data. (*See id.* at 15–16 (citing Docs. 46-A-5; 46-D-8).)

Plaintiff does not challenge this assertion. (*See* Doc. 56.) Instead, he argues that *Egan* is inapplicable because Defendant only suspended, rather than revoked, his security clearance, as there was no final security determination from the CAF. (*See id.* at 1–2; *see also* Doc. 46-D-8.) The Tenth Circuit examined a similar argument in *Hill* and found that "*Egan* extends to the merits of suspension, modification or revocation of a previously granted security clearance, since the underlying rationale applies with equal logic to revocation as it does to an initial grant of authority." 844 F.2d at 1409 (discussing *Egan*, 484 U.S. at 824). Thus, *Egan* applies here, even though Plaintiff's security clearance was only suspended.

Finally, Defendant does not argue that the final notice of proposed termination was also a security-clearance decision, but the Court finds that it lacks jurisdiction to review the merits of that decision as well. In *Hill*, the Tenth Circuit noted that "[u]nder *Egan*, if Hill's clearance had been revoked, *and his job lost as a result*," the district court would not "have had statutory authority to conduct the very type of review Hill urges here . . . —a review which examined the merits and motives of Air Force decisions relating to Hill's clearance, and the nexus between those decisions and national security interests." *See id.* at 1411 (emphasis added); *see also Sanchez*, 870 F.3d at 1198 (noting that plaintiff did not have "the right to contest the merits of the decision to suspend his [security] clearance" to the extent that the decision contributed to "the termination of his federal employment"). In this case, Defendant proposed to remove Plaintiff from federal service based in part on his loss of LAN access, a necessary part of his job. (*See* Doc. 46-D-14.) According to Tenth Circuit precedent, reviewing this decision would implicate national security interests and is outside of this Court's purview. Thus, the Court lacks jurisdiction to review all security-related decisions.

### B. Plaintiff fails to show that Defendant's legitimate, non-discriminatory reasons for the disciplinary actions were pretext for retaliation.

Title VII prohibits employers from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3. Plaintiff asserts that Capt Dinkins's and Col Barney's disciplinary actions were made in retaliation for Plaintiff's threat to file (and later, Plaintiff's actual filing of) an EEO complaint against SMSgt Pivirotto. (*See* Doc. 56 at 3–4.) He offers no direct evidence to support this theory. Because Plaintiff offers only "indirect or circumstantial evidence of discriminatory animus," the Court analyzes his claim using the *McDonnell Douglas* burden shifting framework. *See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) (discussing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)).

To state a *prima facie* case of retaliation, Plaintiff must show "that (1) [he] engaged in protected opposition to discrimination; (2) [he] suffered an adverse action that a reasonable employee would have found material; and (3) a causal nexus exists between [his] opposition and the employer's adverse action." *Id.* (citations omitted). Defendant does not argue that Plaintiff has failed to establish the first or third prongs, only the second prong is at issue. Defendant argues that at least three of the actions Plaintiff complains of—placement on paid administrative leave, the oral admonishment, and the proposal to remove—were not adverse. (*See* Doc. 46 at 2, 17, 23–24.) An "adverse action" is one that is "real and significant" and "produces an injury or harm." *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1265 (10th Cir. 2007) (quotation omitted). Defendant has demonstrated that Plaintiff's pay and benefits were unaffected by these three disciplinary decisions. Thus, "his status with the Air Force remained unchanged[,]" and Plaintiff fails to show

that "he was materially disadvantaged by" any of the three actions. (*See* Doc. 46 at 17.) Plaintiff did not respond to this argument. (*See* Docs. 56; 59 at 12, 15.) Thus, the Court grants summary judgment to Defendant on the basis of these three disciplinary decisions for Plaintiff's failure to establish the second prong.

Assuming Plaintiff had stated a *prima facie* case of retaliation for all of the non-security-related disciplinary actions, the burden shifts to Defendant to produce evidence that Capt Dinkins's and Col Barney's treatment of Plaintiff was due to "a legitimate, nondiscriminatory reason." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quotation omitted). Here, Defendant has offered evidence to show that Capt Dinkins placed Plaintiff on paid administrative leave after consulting with HR because Col Barney had suspended his access to sensitive information, and it was impractical to transfer him to another unit or assign him administrative work. (*See* Docs. 46-D ¶ 6; 46-D-3.) Capt Dinkins orally admonished Plaintiff for his unprofessional conduct on March 26, 2014. (Doc. 46-D ¶ 9.) Capt Dinkins proposed a reprimand (and Col DeMouy later issued the reprimand) due to Plaintiff's carelessness in the February 2014 inventory. (*See id.* ¶ 20; Docs. 46-D-11; 46-D-12.)

Defendant has also offered legitimate, non-retaliatory reasons for the security-related disciplinary actions. Col Barney suspended Plaintiff's access to the LAN, the SIPR and NIPR accounts, and his unescorted access to restricted areas because of his "alleged insubordination and failure to follow direction[,]" his abrasive emails to leadership without respect for the chain of command, and Col Barney's resulting concerns about Plaintiff's unpredictability and the potential for loss or compromise of sensitive data.[10] (*See* Docs. 46-A ¶ 22; 46-A-5.) Capt Dinkins established a SIF "because of [Plaintiff's] failure to follow orders, documented outbursts and

[10] The Court merely examines these security-related decisions in the alternative but maintains that it has no jurisdiction to review the decisions, as explained above.

unprofessional and erratic behavior[,]" which "led [Capt Dinkins] to question [his] judgment and reliability . . . ." (Doc. 46-D-8.) And Capt Dinkins issued the memorandum proposing Plaintiff's removal from federal service due to the loss of LAN and NIPR/SIPR account access, as well as Plaintiff's unprofessional behavior and judgment. (Docs. 46-D ¶ 25; 46-D-14.) Moreover, both Capt Dinkins and Col Barney have affirmed that they did not take any disciplinary action against Plaintiff because of his race, age, or prior EEO activity. (*See*, *e.g.*, Docs. 46-A ¶ 22; 46-D ¶¶ 7, 9, 22.)

Plaintiff argues that some of the stated reasons are false; for example, he asserts without evidentiary support that Capt Dinkins put him on administrative leave in retaliation for his emails to various leaders to complain about Capt Dinkins's discriminatory conduct. (*See* Doc. 56 at 8.) But Defendant's "burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). Thus, the Court finds that Defendant has met his burden to show legitimate, non-retaliatory reasons for all of the disciplinary actions.

Having met his burden of production, the burden again shifts to Plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not [the] true reasons, but were a pretext for [retaliation]." *Id.* at 143 (quotation and citation omitted). "That is, the plaintiff may attempt to establish that he was the victim of [retaliation] 'by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Tex. Dep't of Comm'y Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

Plaintiff makes five points to establish pretext. First, he states that Capt Dinkins testified that "he intended to rate [P]laintiff as failure to meet [a standard] during his next appraisal period." (Doc. 56 at 3 (citing Doc. 56-A at 19–20 (Question 87)); *see also* Doc. 59 at 6–7.) The context of

Capt Dinkins's statement as a whole, though, reveals the intent behind it. Capt Dinkins was asked: "The record contains an evaluation report with a rating of 'acceptable' for [Plaintiff] for the period [April 1, 2012, through March 31, 2014]. The report is signed by you and Captain Brenoskie. . . . Please explain why the concerns with performance were not documented in the evaluation reports." (Doc. 56-A at 19–20.) In response, Capt Dinkins explained that he "took over supervision of [Plaintiff] in April of 2014," and at that time, "there was no documentation of [his] conduct or performance" prior to March 31, 2014. (*Id.* at 20.) "The first incident in question occurred at the end of March with the first action being taken in April of 2014. His next appraisal ([April 1, 2014, through March 31, 2015]) would reflect a failure to meet [a standard] based upon the Oral Admonishment and Letter of Reprimand." (*Id.*) Thus, Capt Dinkins's statement demonstrates how he would have rated Plaintiff following the disciplinary actions in April 2014 and beyond.

Plaintiff next alleges, without evidentiary support, that Capt Dinkins did not conduct an investigation into the allegations made against Plaintiff. (Doc. 56 at 3.) Plaintiff's contention does not controvert Defendant's own evidence that Capt Dinkins "conducted an informal fact-finding regarding the March 26, 2014[] incident." (*See* Doc. 46-D ¶ 5.) Third, Plaintiff asserts that SMSgt Pivirotto was dishonest in his declaration when he said he did not speak to Capt Dinkins about the incident. (Doc. 56 at 3 (citing Doc. 56-C at 8, 10).) As Defendant points out, however, SMSgt Pivirotto did not state that he did not speak to Capt Dinkins at all, but only that no one discussed the contents of an unidentified memorandum with him, and that no one spoke to him about the incident after he submitted his own memorandum. (*See* Doc. 56-C at 8, 10.)

Fourth, Plaintiff disputes Col Barney's statement that he received information about Plaintiff's past unprofessional conduct and claims that any such statements about Plaintiff are false. (Doc. 56 at 3–4.) Even if the statements Col Barney recounted are untrue, however, Col

Barney based his disciplinary decisions in part on conduct that Plaintiff admitted to, and this does not establish pretext. Finally, Plaintiff states that Col DeMouy replaced Col Barney in July 2014. (*Id.* at 4.) Based on these five contentions, Plaintiff fails to show by a preponderance of the evidence that Capt Dinkins's or Col Barney's reasons for the disciplinary actions were a pretext. For this reason, the Court grants summary judgment in favor of Defendant on this claim.

**C. Plaintiff has waived any claim of discrimination.**

Plaintiff includes some language in his Complaint that appears to assert a claim of discrimination based on race or age. (*See* Compl. ¶¶ 23, 86.) At his deposition, Defendant's counsel and Plaintiff had the following exchange:

> Q: [D]o I need to brief this issue having to do with whether or not you were subjected to a hostile work environment that forced you to quit? Because what you're saying now is that all of this stuff happened for retaliatory reasons. It didn't happen because of race and age.
> A: Yeah. It was for retaliatory reasons.
> Q: So do I have to brief this or do we have an agreement?
> A: That's agreed.
> Q: So even though you exhausted that claim during the administrative case, this complaint, all of your allegations in this complaint, have to do with retaliation?
> A. Yes.

(Doc. 46-C at 178:5–19.) Defendant asserts that this exchange is evidence that Plaintiff waived any claim of discrimination. (*See* Doc. 46 at 10.) Plaintiff did not respond to this argument, nor did Plaintiff include any evidence or argument regarding discrimination in his response to Defendant's motion. (*See* Doc. 56 at 15–16 (mentioning only retaliation under Title VII).) Accordingly, the Court finds that Plaintiff has waived any claim based on discrimination.

**D. Plaintiff fails to establish a constructive discharge claim.**

"To prevail on a constructive discharge claim, a plaintiff must show either that (1) 'the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign,'" *Hall v. U.S. Dep't*

*of Labor, Admin. Review Bd.*, 476 F.3d 847, 860 (10th Cir. 2007) (quoting *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 534 (10th Cir. 1988)), "or (2) the employer by its discriminatory actions forced the plaintiff to choose between resignation or termination," *id.* (citing *Burks v. Okla. Publ'g Co.*, 81 F.3d 975, 978 (10th Cir. 1996); *Acrey v. Am. Sheep Indus. Ass'n*, 981 F.2d 1569, 1573–74 (10th Cir. 1992)). The Court "evaluate[s] the voluntariness of an employee's resignation under an objective, totality of the circumstances standard." *Fischer v. Forestwood Co.*, 525 F.3d 972, 980 (10th Cir. 2008) (citing *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1136 (10th Cir. 2004)). The burden to show a constructive discharge is substantial. *Id.* (citations omitted).

Plaintiff cannot establish constructive discharge based on the first theory, because he fails to show that his working conditions were objectively intolerable. Plaintiff claims members of leadership retaliated against him for filing an EEO complaint by building a false case against him in order to terminate him, and that they eventually proposed his removal based on these false claims. (*See* Compl.) As the Court has already found, however, Defendant has established legitimate, non-retaliatory reasons for the disciplinary actions, and Plaintiff fails to establish any other discriminatory conduct that created difficult working conditions sufficient to show constructive discharge. Additionally, the working conditions were not so intolerable that Plaintiff had to quit right away—he waited approximately six months from the time he was placed on paid administrative leave before resigning, and he sought and obtained other employment in the interim. *See, e.g.*, *Land v. Midwest Office Tech., Inc.*, 114 F. Supp. 2d 1121, 1146 (D. Kan. 2000) (plaintiff failed to show constructive discharge in part because she sought jobs with other employers before she resigned).

Nor can Plaintiff establish constructive discharge based on the second theory, because he was not forced to choose between resignation or termination. Capt Dinkins's notice of proposed

termination encouraged Plaintiff to respond. (Doc. 46-D-14.) The notice advised Plaintiff that "[n]o final decision had been made[,]" and "full and careful consideration will be given to any replies [Plaintiff] submit[s] during the response period." (*Id.* at 2.) Plaintiff was given the option to "receive up to four hours of government time to obtain advice and assistance" in the preparation of a response. (*See id.*) Plaintiff also had the option to obtain representation. (*See id.*) Rather than responding, however, Plaintiff simply submitted his resignation. In deciding whether an employee was constructively discharged, the Tenth Circuit considers "whether the employee was given some alternative to resignation." *Premratananont v. S. Suburban Park & Recreation Dist.*, 149 F.3d 1191 (10th Cir. 1998) (quoting *Yearous v. Niobrara Cty. Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997)). Because Plaintiff did not attempt to respond to the notice of proposed removal, he cannot establish that he had no alternative to resignation. *See id.* (finding no constructive discharge where employee did not utilize the employer's internal grievance procedure to address allegedly retaliatory conduct). Consequently, the Court will grant summary judgment to Defendant on Plaintiff's constructive discharge claim.

### E. Plaintiff cannot maintain a claim for negligence.

Plaintiff includes a section entitled "Negligence" in his Complaint and asserts that senior leadership was negligent in failing to enforce Kirtland's policy on discrimination by colluding to force Plaintiff to resign, by giving false statements about Plaintiff, and by failing to investigate his claims.[11] (*See* Compl. ¶¶ 91–92.) Plaintiff does not mention the FTCA, but the Court notes that "[t]he FTCA provides the exclusive remedy for claims for monetary damages brought against federal employees who commit damaging negligent or wrongful acts while acting within the scope of their employment, even if a plaintiff fails to name the United States in [his] complaint." *McNabb*

[11] Plaintiff also asserts negligence for removing his LAN access, a decision that is unreviewable as discussed earlier in this Opinion.

*v. U.S. Air Force*, No. 13CV1048 JCH/GBW, 2013 WL 12328817, at *6 (D.N.M. Nov. 4, 2013) (citing *Pretlow v. Garrison*, 420 F. App'x. 798, 802 (10th Cir. 2011)).

"[A] plaintiff suing under the FTCA must comply with the statute's notice requirements, which are jurisdictional, cannot be waived, and must be strictly construed." *Id.* at *7 (citing *Trentadue v. United States*, 397 F.3d 840, 852 (10th Cir. 2005)). "The FTCA requires complete exhaustion of administrative remedies before a plaintiff may file suit in federal court." *Id.*

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

*Id.* (quoting 28 U.S.C. § 2675(a)). Here, Plaintiff fails to show that he presented his tort claim to the appropriate agency in an attempt to exhaust his administrative remedies under the FTCA. Thus, the Court does not have jurisdiction to consider the negligence claim and will dismiss it.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment and Memorandum in Support (Doc. 46) is **GRANTED** as detailed herein;

**IT IS FURTHER ORDERED** that Plaintiff's claim for discrimination pursuant to Title VII is dismissed as waived, and his claim for negligence is dismissed for lack of jurisdiction;

**IT IS FURTHER ORDERED** that this case is **DISMISSED**.

______________________________
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE